# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STEPHEN M. GOOD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 04-CV-799-SAJ |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

### OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2] Plaintiff asserts that the Commissioner erred because (1) the ALJ failed to properly weight the treating physicians' opinions; (2) the ALJ failed to properly assess Plaintiff's residual functional capacity; (3) the ALJ erred in finding Plaintiff could perform other work; (4) the ALJ failed to properly evaluate Plaintiff's credibility; and that (5) a reversal for payment of benefits is mandated. For the reasons discussed below, the Court **reverses and remands** the Commissioner's decision for further proceedings consistent with this opinion.

---

[1] This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2] Administrative Law Judge Stephen C. Calvarese (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated March 22, 2001. [R. at 12]. Plaintiff appealed the decision by the ALJ to the Appeals Council. The Appeals Council declined Plaintiff's request for review on October 11, 2002. [R. at 6]. Plaintiff appealed this decision, and it was reversed by the District Court by Order dated December 24, 2003. [R. at 368]. Following remand, the ALJ issued a partially favorable decision to Plaintiff by decision dated July 22, 2004. [R. at 262]. Plaintiff appealed this decision to the Appeals Council. [R. at 256].

## I. FACTUAL AND PROCEDURAL HISTORY

In his disability report, Plaintiff noted that he was unable to work due to hip replacements, hypertension, cirrhosis of the liver, and arthritis. [R. at 108]. Plaintiff noted that he could not work without suffering severe pain. [R. at 108]. Plaintiff's medication list included medications for high blood pressure and a muscle relaxant. [R. at 113].

Plaintiff had two hearings before the ALJ. Plaintiff's first hearing before the ALJ occurred on May 4, 2001. [R. at 24]. Dr. Harold Goldman testified at the hearing. [R. at 29]. Dr. Goldman stated that he reviewed Plaintiff's file. [R. at 30]. The doctor noted that Plaintiff had bilateral aseptic necrosis of his hips which required a bilateral hip prosthesis with excellent results. The record reviewed by the doctor also indicated that Plaintiff complained of pain in his neck. [R. at 30-31]. According to the doctor, Plaintiff's hips should be relatively less painful. [R. at 32]. The doctor noted that Plaintiff probably had arthritis in his cervical area and some pain with the arthritis. [R. at 32]. Plaintiff also complained of low back pain and carpal tunnel syndrome. [R. at 32]. Dr. Goldman testified that Plaintiff's exertional limitations were probably 30 pounds occasionally and 50 pounds frequently. [R. at 32]. Plaintiff should walk no more than two hours in an eight hour day. [R. at 33]. Dr. Goldman noted that sitting, pushing and pulling were not affected by Plaintiff's limitations. [R. at 34]. Plaintiff had carpal tunnel surgery, and after 1993 should be able to reach, handle, finger and feel without restriction. [R. at 35]. The doctor also noted that Plaintiff had had a colostomy and that the doctor had not considered the colostomy when determining Plaintiff's restrictions, and the colostomy would further limit Plaintiff. [R. at 36]. The doctor noted that the additional restrictions from Plaintiff's colostomy would probably not last twelve months. [R. at 37].

Plaintiff was born January 26, 1952. [R. at 94]. Plaintiff testified that he was 49 years old at the time of the first hearing before the ALJ. [R. at 40]. According to Plaintiff, during the examination with Dr. Al Fakier, Plaintiff was unable to touch his toes and he almost tripped. [R. at 41]. Plaintiff also stated that he experienced pain when he squatted. [R. at 41]. The examination lasted 15 minutes. [R. at 42]. Plaintiff also stated that he was unable to understand the doctor. [R. at 42].

Plaintiff testified that he completed the ninth grade and obtained his GED. [R. at 43]. Plaintiff was 5'10" and weighed 165. [R. at 43]. Plaintiff previously worked on power lines for approximately 23 years. [R. at 43].

According to Plaintiff, he was treated for alcoholism in 1999. [R. at 45]. Plaintiff began having problems with his hips in 1993 and had surgery. [R. at 45]. According to Plaintiff, the pain did not completely go away. Plaintiff stated that he tries not to move a lot because of his pain. [R. at 45]. Plaintiff can walk for about five to ten minutes but then he experiences pain and he must sit. Plaintiff believes he can sit for about 15 to 20 minutes. [R. at 46]. Plaintiff generally sits in a recliner to elevate his legs. [R. at 47]. Plaintiff does not lift anything. [R. at 47]. Plaintiff noted that he takes Vioxx for pain. [R. at 48].

Plaintiff testified that he drives for short periods of time but that it causes pain to drive. [R. at 49]. Plaintiff drove 90 miles to the hearing in Tulsa, but stopped twice to get out of the car and stretch. [R. at 49]. Plaintiff shops for groceries about once each week, and takes about 15 to 20 minutes. [R. at 50].

Plaintiff testified that on an average day, Plaintiff wakes at 7:00 a.m., and sits in his recliner to watch television. [R. at 51]. Plaintiff walks to a neighbor's house about every other day to talk. [R. at 51]. Plaintiff's neighbor lives about one block from Plaintiff, and it

takes Plaintiff about five to ten minutes to walk the distance. [R. at 57]. Plaintiff fishes about once each week. [R. at 56]. Plaintiff fishes for about two hours. [R. at 56].

Plaintiff testified that he had completed two 28 day detoxification alcohol programs. One was completed in 1997, and Plaintiff relapsed about one month after that program. The second program was completed in 1999. Plaintiff stated that, at the time of the hearing, he drank about two beers each day whereas Plaintiff was previously drinking about one-fifth of whiskey each week. [R. at 60]. Plaintiff smoked about one pack each day. [R. at 60].

Plaintiff has a bag from his colostomy. According to Plaintiff he must change the bag at least three times each day and it takes 15 to 20 minutes to change it. [R. at 63].

In his disability report, Plaintiff wrote that on an average day he ate breakfast about one-half of the time, watched television, read, did some yard work, and tried to walk. [R. at 127]. According to Plaintiff, he usually slept about four to six hours each night. [R. at 127]. Plaintiff noted that he was able to prepare all of his meals, but that his meal preparation took longer than previously. [R. at 128]. Plaintiff shopped for necessities about one time each week. [R. at 129]. Plaintiff indicated that he fished once every few months for a few hours at a time. [R. at 130]. Plaintiff wrote that he could drive well but that he had to stop when he began hurting. [R. at 131].

Plaintiff completed a medications list on April 17, 2001, indicating that he took Vioxx for pain and Cardizem for high blood pressure. [R. at 151].

On August 7, 1987, Plaintiff complained of a twisted knee. [R. at 160]. Plaintiff's knee was warm. The doctor did an arthrocentesis. The x-ray was negative for boney deformities. Plaintiff was placed on a knee immobolizer. [R. at 160].

A doctor's report dated June 7, 1993 indicated Plaintiff was having pain on the inside of both of his thighs down to his knees since December 1992. [R. at 161]. The pain was worse with walking and standing. [R. at 161].

Plaintiff was examined May 3, 1994 by Dr. Evans in connection with Plaintiff's Workers' Compensation claim. [R. at 179]. Plaintiff was injured on July 6, 1993. In addition, two years prior to the injury Plaintiff developed pain in his left hip and began limping. Plaintiff later developed pain in his right hip. Plaintiff previously had surgery on his left ankle. Plaintiff smoked two packs of cigarettes each day and drank one quart of liquor each week. [R. at 179]. Plaintiff walked with an antalgic gait and had painful rotation of both of his hips. X-rays indicated avascular necrosis and joint irregularity. [R. at 179]. The doctor noted that, in his opinion, "the most likely etiology of this man's problem is alcohol injection." [R. at 180]. The doctor recommended that Plaintiff undergo bilateral total hip replacement. The doctor noted that following hip replacement Plaintiff would "be unable to resume his occupation as a lineman and will most likely have to find some sedentary type occupation." [R. at 180].

Plaintiff was admitted with aseptic necrosis of his hips on September 27, 1994. [R. at 163]. Plaintiff had a total hip arthroplasty and did well postoperatively. [R. at 163]. Plaintiff was discharged October 1, 1994. [R. at 163].

On April 25, 1995, Plaintiff was admitted for right hip avascular necrosis with degenerative joint changes. [R. at 170]. Plaintiff had a right total hip replacement and was discharged on April 28, 1995. [R. at 170].

On May 5, 1995, Plaintiff was reportedly experiencing muscle spasms in his distal and medial quadriceps. [R. at 177]. Plaintiff was doing well on May 26, 1995 with minimal

pain and increasing activities. [R. at 177]. Plaintiff did not keep his scheduled June or July appointments. [R. at 177]. On August 8, 1995, Plaintiff's hip was doing well and x-rays show satisfactory position. Plaintiff was continuing his rehabilitation and trying to increase his activities. Plaintiff was reported as totally disabled. [R. at 177]. Plaintiff returned on October 30, 1995 for reevaluation. Plaintiff exhibited a satisfactory gait with no other abnormality. [R. at 177]. The doctor noted that Plaintiff had reached a point of stability which permitted Plaintiff's release from his care. Based on the AMA guidelines, the doctor noted that Plaintiff had an impairment equal to 20% of the whole body for his right hip with an additional 20% impairment based on surgery on his left hip. [R. at 177]. The doctor determined Plaintiff required permanent restrictions with no prolonged standing, no lifting in excess of thirty pounds, and no bending or stooping. [R. at 177]. Dr. Evans wrote a letter on behalf of Plaintiff on October 30, 1995. [R. at 232]. Dr. Evans indicated that Plaintiff was six months post surgery and was doing well, exhibiting a satisfactory gait and no other abnormality. [R. at 232]. He noted the same restrictions of impairment for Plaintiff. [R. at 232].

Plaintiff was admitted December 1, 1999 and discharged December 3, 1999. [R. at 184]. Plaintiff was admitted for "intractable neck pain secondary to acute musculoskeletal ligaments origin and associated spasm of the muscles." [R. at 184]. Plaintiff went to the emergency room with severe acute neck pain which occurred over a three day period. Plaintiff was placed on steroids and muscle relaxers which resolved his neck pain and Plaintiff was discharged in stable condition. [R. at 184]. X-rays of Plaintiff's cervical vertebra indicated a small osteophyte on the anterior inferior margin of the C7 vertebra but otherwise appeared normal. [R. at 202]. Disc spaces were maintained. [R. at 202].

Plaintiff was examined by Saad M. Al-Shathir, M.D., for a Social Security evaluation on March 21, 2000. [R. at 203]. Plaintiff complained of bilateral hip pain when walking a distance or attempting to squat. Plaintiff noted painful hand use in his right hand more than his left hand when hands were excessively used. [R. at 203]. Plaintiff complained of low back pain for the past several years which increased with bending or lifting, and neck pain for the previous several months. [R. at 203]. Plaintiff also complained of knee pain for the previous 15 years which increased with standing or squatting. [R. at 203]. Plaintiff's prior surgeries included a total hip replacement in 1994 and 1995, left ankle reduction/internal fixation, and right carpal tunnel syndrome release. [R. at 203]. Plaintiff's muscle tone was normal. [R. at 203]. The doctor noted no clinical evidence of acute synovitis or arthritis; no deformity, swelling, redness or heat, and no spasm or localized tenderness. [R. at 203]. Plaintiff's gait was normal in speed and stability. [R. at 204]. The doctor noted subjective complaints of hip pain, hand joint pain, low back pain, neck pain without loss of range of motion, knee pain without loss of range of motion, and chronic bronchitis. [R. at 204]. Plaintiff also informed the doctor that he had been told he had liver cirrhosis. [R. at 204]. The doctor indicated that Plaintiff had full flexion of his fingers, could effectively oppose the thumb to the finger tips and manipulate small objects. [R. at 205]. The range-of-motion records are stricken thru with a line, and the word "full" written on the document. [R. at 205-06].

A Medical Source Statement of Ability to do Work-Related Activities (Physical) form was completed May 4, 2001, by a neurologist. The neurologist noted that the statement was accurate for Plaintiff's abilities from September 30, 1999 to "present." [R. at 253]. Plaintiff was noted as being able to lift 30 pounds occasionally and frequently, being able

to stand two hours in an eight hour day, being able to frequently balance, but only occasionally climb, kneel, crouch, or crawl. [R. at 254].

A Residual Physical Functional capacity Assessment was completed by Paul Woodcock on May 12, 2000. [R. at 213]. He noted that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for six hours in an eight hour day and sit for six hours in an eight hour day. [R. at 214]. The doctor noted that Plaintiff exhibited no joint deformities, redness, or swelling in his examinations, and had a full range of motion of the joints and spine. Plaintiff's gait, grip and dexterity were normal. [R. at 214].

Plaintiff was admitted with acute abdominal pain on January 14, 2001. [R. at 241]. Plaintiff presented with a two day history of increasingly severe lower abdominal pain and on examination had acute periotoneal irritation. Plaintiff had surgery which involved a resection and colostomy. Plaintiff was, post operatively, described as doing well on a regular diet. [R. at 241]. The intake notes indicated that Plaintiff smoked one pack of cigarettes per day and had a moderate to heavy history of alcohol use. [R. at 242].

Plaintiff was admitted for surgery on February 19, 2002, and discharged February 25, 2002. [R. at 394]. Plaintiff has a takedown colostomy and reanastomosis of the colon. [R. at 394]. The notation of "estimated disability" on the surgeon's report is "six weeks." [R. at 394].

A letter dated May 25, 2004, by C. Joseph Chouteau, M.D., indicates that Plaintiff suffers from disc disease with protrusion at L5-S1 on an April 7, 2003 MRI. The doctor noted that he believed this was the cause of Plaintiff's back pain, and that prolonged standing, bending, and lifting would cause pain. The doctor noted that he would permanently restrict Plaintiff from "performing those activities." [R. at 403].

Plaintiff's second hearing before the ALJ occurred on May 26, 2004. [R. at 290]. Dr. Phillip B. McCowan, a board certified orthopedic surgeon testified at the hearing. [R. at 295]. The doctor noted that he saw no significant back problems. [R. at 296]. Plaintiff's first reported problems were in May 17, 1993, related to his hip pain. Plaintiff had a total hip joint replacement in May 1994 and March 1995. Plaintiff was released with lifting restrictions of nothing over 30 pounds. [R. at 297]. Plaintiff had a stomach colostomy in 2001. [R. at 297]. The doctor stated that Plaintiff had severe problems from May 1993 until his release in October 1995. [R. at 298]. During that time, the doctor testified that Plaintiff met a Listing impairment. [R. at 298].

The doctor stated that he agreed with the restrictions provided by Dr. Evans with regard to Plaintiff. [R. at 300]. The doctor noted that he believed Plaintiff could stand for two or three hours at a time, or a total of four to six hours during the day. [R. at 300]. He noted no sitting limitation for Plaintiff. [R. at 301]. Plaintiff should not bend past 90 degrees. [R. at 301].

The doctor testified that Plaintiff's alcohol difficulties played a significant factor in the vascular necrosis of Plaintiff's hips. According to the doctor, a significant amount of alcohol usage, over time, would be required. [R. at 303].

Plaintiff had a colostomy in January 2001. [R. at 304]. It was removed February 19, 2002. [R. at 304]. The doctor noted that the record revealed no additional complications. [R. at 305].

Plaintiff testified that he stopped working in 1993 due to pain in his hips. [R. at 317]. According to Plaintiff, Plaintiff continued to have problems after the surgery. [R. at 318]. Plaintiff experiences pain with standing and bending. [R. at 319]. Plaintiff believes he can

-- 9 --

stand for about five to ten minutes. [R. at 320]. Plaintiff can walk for approximately one-half block before he must stop. Plaintiff noted that he rides his lawnmower when possible. [R. at 320]. Plaintiff can sit for about five to ten minutes, and prefers to sit in his recliner. [R. at 321].

According to Plaintiff, since 1995, Plaintiff has walked slowly with a limp, and shifting his weight from hip to hip. [R. at 321]. Plaintiff described his pain as constant. [R. at 322]. Plaintiff is in his recliner for approximately two hours each day. [R. at 322].

From 1995 until 1999, Plaintiff could drive, but for only 20 or 30 minutes. [R. at 324]. During that time frame, Plaintiff did some household chores, including washing dishes, sweeping the floor, and his laundry. [R. at 325].

According to Plaintiff, the surgery for carpal tunnel syndrome on his right hand relieved his most severe pain but did not completely eliminate his pain. [R. at 328]. Plaintiff still fishes a bit, but Plaintiff has difficulty sitting. [R. at 330]. Plaintiff does sometimes mow his lawn, but he has to sit and take breaks, and the lawn takes about one hour to complete. [R. at 332].

With regard to his colostomy, Plaintiff noted that he was required to change the colostomy bag two to three times each day between the hours of 8:00 and 5:00. [R. at 334]. Plaintiff believes he can lift about 15 pounds. [R. at 338].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

1994).  The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational.  *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.  *Glass*, 43 F.3d at 1395.

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

In the ALJ's decision dated May 22, 2001, the ALJ found that Plaintiff had the RFC to lift a maximum of 20 pounds, and perform the requirements consistent with light work activity.  [R. at 19].  The ALJ concluded that Plaintiff was unable to return to his past relevant work.  [R. at 19].  Based upon the testimony of a vocational expert, the ALJ concluded that Plaintiff could perform work in the national economy.  [R. at 20].  This

---

[4/] Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

decision was reversed by the District Court with directions to address Plaintiff's colostomy.

Following a second hearing before the ALJ, on July 22, 2004, the ALJ issued a "partially favorable" decision. [R. at 262]. The ALJ noted that Plaintiff had insured status only through September 30, 1999, and that in order to be eligible for Disability Insurance Benefits, Plaintiff must establish that he had a disability on or before that date. [R. at 265]. The ALJ found that Plaintiff was entitled to benefits from May 1, 1993 to October 16, 1998. The ALJ also found that Plaintiff was disabled from January 1, 2001 to February 1, 2002. [R. at 270]. The ALJ determined that Plaintiff was not disabled from October 19, 1998 until December 31, 2000, or after February 2, 2002.

## IV.  REVIEW

**THE MEDICAL IMPROVEMENT STANDARD**

Plaintiff does not raise the ALJ's failure to follow the medical improvement standard as a specific issue. Plaintiff notes, in a footnote, that the Tenth Circuit Court of Appeals has held that cases involving a determination of a closed period of disability should be evaluated in accordance with the "medical improvement standard." The Court has reviewed the record and concluded that reversal is warranted based upon the ALJ's evaluation of Plaintiff's credibility. On remand, the ALJ should apply the medical improvement standard. *See Shepherd v. Apfel*, 184 F.3d 1196,1200 (10th Cir. 1999); 20 C.F.R. § 404.1594.

**CREDIBILITY ANALYSIS**

Plaintiff testified that he was unable to perform the full requirements of work because of pain. Plaintiff challenges the ALJ's evaluation of Plaintiff's credibility.

Initially, the ALJ's evaluation of Plaintiff's credibility is troubling because of the differing statements the ALJ makes about Plaintiff's credibility. The ALJ notes that in reaching his conclusion the ALJ "has considered the claimant's allegations and has found them generally credible . . . . " [R. at 268]. The very next sentence in the ALJ's decision finds that after a thorough review of the record and the testimony the ALJ finds "that the claimant is not fully credible." One reason given for this finding is that the record was clear that Plaintiff was disabled during the closed periods . . . "there is indication that the claimant was unable to work after he had recovered from his hip surgeries. . . ."[5/] Finally, in the ALJ's "findings," the fifth finding is, the "claimant's assertions concerning his ability to work are credible." Defendant attempts to explain the inconsistencies by noting that the "tone" of the ALJ's decision is clear and the ALJ did not find Plaintiff fully credible. The Court finds, however, the numerous inconsistent statements regarding Plaintiff's credibility troubling.

Even if the Court assumes that all of the ALJ's references to credibility are not inconsistent, the ALJ additionally provides little support for his credibility conclusions. The ALJ provides three reasons for discounting Plaintiff's credibility. First, that the record is clear that Plaintiff was "unable to work" after recovering from hip surgeries and had been released from his doctor. Second, that Plaintiff vacillated in his recount of his alcohol consumption. Third, that none of Plaintiff's treating physicians concluded that Plaintiff could not perform work.

---

[5/] Based on the wording of this statement in the ALJ's decision, the ALJ probably meant that Plaintiff was able to work. However, this is an inconsistency that is apparent in the ALJ's decision.

Plaintiff asserts that he is unable to work due to pain. The analysis of Plaintiff's credibility by the ALJ is basically an analysis of Plaintiff's complaints of pain. The legal standards for evaluating pain are outlined in 20 C.F.R. §§ 404.1529 and 416.929, and were addressed by the Tenth Circuit Court of Appeals in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987). First, the asserted pain-producing impairment must be supported by objective medical evidence. *Id.* at 163. Second, assuming all the allegations of pain as true, a claimant must establish a nexus between the impairment and the alleged pain. "The impairment or abnormality must be one which 'could reasonably be expected to produce' the alleged pain." *Id.* Third, the decision maker, considering all of the medical data presented and any objective or subjective indications of the pain, must assess the claimant's credibility.

> [I]f an impairment is reasonably expected to produce some pain, allegations of disabling pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence.

Id. at 164. In assessing the credibility of a claimant's complaints of pain, the following factors may be considered.

> [T]he levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Hargis v. Sullivan*, 945 F.2d 1482, 1488 (10th Cir. 1991). *See also Luna*, 834 F.2d at 165 ("For example, we have noted a claimant's persistent attempts to find relief for his pain and his willingness to try any treatment prescribed, regular use of crutches or a cane, regular

contact with a doctor, and the possibility that psychological disorders combine with physical problems. The Secretary has also noted several factors for consideration including the claimant's daily activities, and the dosage, effectiveness, and side effects of medication.").

Initially, the ALJ references the release by Plaintiff's doctors as support for a conclusion that Plaintiff was able to return to work. The ALJ's opinion, provides, in what is presumably a typographical error, that Plaintiff is "unable" to work after being released by his doctors. The ALJ additionally discounts Plaintiff's credibility because none of Plaintiff's doctors opined that Plaintiff was disabled. All of the ALJ's analysis bypasses *Luna*. The ALJ should assess the pain producing impairment to determine if medical evidence supports a finding that the impairment can produce pain. In this case, the record certainly supports such a conclusion. The record supports a conclusion that hip replacements may cause pain. In addition, some medical evidence suggested an MRI done on Plaintiff could support Plaintiff's complaints of back pain. Further, the doctor who testified at the hearing noted that hip replacements work in 95% of the cases, and pain was subjective. The only other reason given by the ALJ for discounting Plaintiff's credibility is that Plaintiff vacillated with regard to statements made about his alcohol consumption. The ALJ references no statements. The record does indicate that, at various times Plaintiff stated that he was drinking hard liquor, whiskey or only beer. Furthermore, at different times Plaintiff stated the amount of alcohol he consumed varied. The ALJ references no statements in the record that contradict as to the time frames within which the amount of alcohol Plaintiff stated he consumed varied with respect to the amount he later stated he consumed. Furthermore, the ALJ did not evaluate numerous factors discussed by the Court in *Luna*, for example the levels of medication and effectiveness, the extensiveness

of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

On remand, the ALJ should evaluate the Plaintiff's credibility and consider the factors outlined by the Tenth Circuit Court of Appeals in *Luna*.

**REVERSAL FOR PAYMENT OF BENEFITS NOT MANDATED**

Plaintiff notes that Plaintiff's case is appropriately referred to as a "medical improvement" case. Plaintiff notes that in a case in which the ALJ terminated benefits based on the medical improvement standard, *Hayden v. Barnhart*, 374 F.3d 986 (10th Cir. 2004), the Tenth Circuit Court of Appeals, in reversing the decision of the Commissioner remanded the action for an entry of benefits because the reversal translated into a finding that the termination decision was no longer in effect and the plaintiff therefore retained her disability status before the Commissioner. The Court is not persuaded that, under the facts of this case, *Hayden* requires a reversal and remand for benefits. The effect of this Court's decision is to vacate the decision of the Commissioner which both granted and denied benefits to Plaintiff. If that decision is no longer in effect, the prior status of Plaintiff with the Commission is that Plaintiff was not entitled to benefits. In *Hayden*, which is a termination action, vacating the termination decision meant that the plaintiff was entitled to benefits because the Commissioner's decision to terminate benefits was no longer in effect. The Court is not persuaded that *Hayden* requires a remand for benefits.

Dated this 24th day of January 2006.

Sam A. Joyner
United States Magistrate Judge

-- 17 --